HAMPSON, Judge.
 

 *423
 

 Factual and Procedural Background
 

 Tony Sami Botros (Respondent) appeals from an Order (Disability Order) transferring him to "disability inactive status."
 
 [1]
 
 The evidence presented at Respondent's hearing tends to show the following:
 

 At all relevant times, Respondent, who was admitted to the North Carolina Bar in 2013, was engaged in the practice of law and maintained an office in Wake County. In March of 2018, Respondent was representing the plaintiff in a tort case before Wake County Superior Court, and the defendant had filed a motion for summary judgment with the court, which was scheduled to be heard the week of 26 March 2018. On 26 March 2018, Superior Court Coordinator, Lisa Tucker, notified Respondent that
 
 *424
 
 the summary judgment motion would be heard at 12:00 p.m. on 29 March 2018 in courtroom 10-B of the Wake County Courthouse, with Superior Court Judge A. Graham Shirley (Judge Shirley) presiding.
 

 On the morning of 29 March 2018, Respondent also had an unrelated custody hearing before Wake County District Court Judge Ashleigh P. Dunston (Judge Dunston) in courtroom 2-A of the Wake County Courthouse. Respondent appeared in Judge Dunston's courtroom at approximately 9:40 a.m. When Respondent's opposing counsel sought to call a six-year-old girl to testify, Judge Dunston called both Respondent and opposing counsel into chambers and suggested the parties attempt to mediate a resolution. While in chambers, Judge Dunston began to suspect Respondent might be impaired based on his slurred speech, dilated eyes, and incoherent arguments.
 

 As noon approached, Respondent and opposing counsel had not reached an agreement regarding their clients' custody dispute. As a result, Respondent failed to appear in Judge Shirley's courtroom for the hearing on the summary judgment motion. Around this time, the clerk from Judge Dunston's courtroom called the clerk in Judge Shirley's courtroom to notify Judge Shirley of Respondent's whereabouts and that Respondent was unsure which court, superior or district
 
 *700
 
 court, had priority. Upon being notified of Respondent's dilemma, Judge Shirley went to Judge Dunston's courtroom to discuss the matter.
 

 When Judge Shirley arrived in Judge Dunston's courtroom, Judge Dunston informed Judge Shirley of her suspicions regarding Respondent's potential impairment. During their discussions, the two judges decided Judge Shirley had priority and ordered Respondent to report to Judge Shirley's courtroom to address the summary judgment motion. Thereafter, Judge Shirley left Judge Dunston's chambers and rode the elevator back to his courtroom with Respondent.
 

 Upon arriving in Judge Shirley's courtroom, Respondent appeared distressed and requested five minutes to "collect himself," which Judge Shirley allowed. While Respondent was away, Judge Shirley requested Lisa Tucker and Kellie Myers, who was the Trial Court Administrator in Wake County, accompany him in chambers, as Lisa Tucker had encountered Respondent on a previous occasion and could gauge whether Respondent's behavior was consistent with her previous interaction with him. When Respondent returned to the courtroom, Judge Shirley requested both Respondent and opposing counsel join him in chambers.
 

 Once in chambers, "[i]t became readily apparent to [Judge Shirley] that [Respondent] was impaired" because his pupils were dilated, his
 
 *425
 
 speech was slurred, and he did not have "a rational thought process." When asked by Judge Shirley if he was on any medication or other mind-altering substances, Respondent admitted he took antidepressants, as he suffered from an anxiety disorder and depression, but adamantly denied he was impaired. Based on Respondent's condition, Judge Shirley informed Respondent that he believed Respondent was impaired and unable to represent his client, and that he intended to continue the hearing to the following week. Respondent insisted Judge Shirley allow him to state on the record he was not impaired and was ready to proceed with the hearing. However, Judge Shirley refused Respondent's calls to go on the record in order to save Respondent from publicly damaging his reputation with his client. Thereafter, Respondent was allowed to leave, and the summary judgment hearing was continued until 6 April 2018.
 

 Upon leaving Judge Shirley's chambers, Respondent returned to Judge Dunston's courtroom. Judge Dunston informed Respondent that she would not allow him to proceed with the custody hearing and asked Respondent if he would submit to an examination by a drug recognition expert (DRE). Respondent initially agreed to the DRE examination. However, when the DRE arrived, Respondent stated he was embarrassed and wanted to leave, and refused to submit to the DRE examination. Thereafter, Respondent left.
 

 On 6 April 2018, Respondent returned to Judge Shirley's courtroom for the hearing on the summary judgment motion. Respondent arrived at the hearing late, and after approximately two-thirds of his argument, Respondent stopped and asked Judge Shirley if he could pause to have a drink of water, which Judge Shirley allowed. Thereafter, Respondent informed Judge Shirley that he was not on his "A-game" and requested the court continue the matter, which Judge Shirley denied. At the conclusion of the hearing, Judge Shirley took the matter under advisement and requested Respondent accompany him back to chambers.
 

 Once in chambers, Judge Shirley expressed his concerns regarding Respondent's behavior on 29 March 2018, which he believed amounted to contempt of court. Judge Shirley also informed Respondent that he believed Respondent was impaired on 6 April 2018 as well. Based on these concerns, Judge Shirley presented Respondent with a draft Motion to Show Cause for Contempt and told Respondent he would not file this Motion if Respondent would voluntarily seek evaluation and treatment through the Lawyer Assistance Program (LAP). As a further condition, Judge Shirley required Respondent sign a release allowing the LAP to report Respondent's compliance status to Judge Shirley. Thereafter,
 
 *426
 
 Respondent agreed to Judge Shirley's request and signed the release (LAP Agreement).
 
 *701
 
 At 4:37 a.m. on 2 May 2018, Respondent sent an email to Kellie Myers revoking the LAP Agreement and declaring it "null and void," contending he was initially coerced into signing the LAP Agreement. Respondent also sent an email to the Eastern Clinical Coordinator of the LAP revoking the LAP Agreement.
 

 After learning of Respondent's revocation of the LAP Agreement, Judge Shirley filed an Order to Show Cause (Show Cause Order), which was served on Respondent on 15 May 2018. The Show Cause Order stated, in pertinent part:
 

 YOU ARE HEREBY GIVEN NOTICE THAT ... a hearing will be held ... to determine whether this Court shall impose professional discipline or transfer your law license to disability inactive status as a result of your recent conduct within the Tenth Judicial District.
 

 The Court initiates this action on its own motion, pursuant to its inherent authority to regulate the conduct of officers of the court. The information before the Court (as more specifically set forth herein) raises the question of whether you have violated the North Carolina Rules of Professional Conduct, or in the alternative, whether you are presently suffering from a mental or physical condition (which may include but is not limited to mental illness and/or substance abuse) which significantly impairs your professional judgment, performance, or competency as an attorney.
 

 On 1 June 2018, a hearing on the Show Cause Order came on before Wake County Senior Resident Superior Court Judge Paul C. Ridgeway (Judge Ridgeway). Respondent attended this hearing and represented himself
 
 pro se
 
 . At the end of the day, Judge Ridgeway adjourned the hearing and notified Respondent that the hearing would resume on 6 June 2018. However, Respondent failed to appear on 6 June 2018 when the hearing resumed. At the conclusion of the 6 June 2018 hearing, Judge Ridgeway took the matter under advisement, and on 8 June 2018, Judge Ridgeway entered the Disability Order transferring Respondent to disability inactive status. On 9 July 2018, Respondent timely filed Notice of Appeal from the Disability Order.
 

 *427
 

 Issues
 

 Respondent raises several arguments on appeal, and these arguments distill into the following issues: (I) whether the trial court's Findings of Fact are supported by competent evidence; (II) whether the trial court had subject matter jurisdiction to place Respondent on disability inactive status; (III) whether Respondent was afforded the requisite due process, including proper notice of the proceedings; and (IV) whether the trial court's Findings and Conclusions supported placing Respondent on disability inactive status.
 

 Standard of Review
 

 Respondent challenges numerous Findings of Fact and Conclusions of Law in the trial court's Disability Order. When reviewing an order of a trial court entered pursuant to its inherent authority to regulate officers of the court, "[f]indings of fact made by the trial judge are conclusive on appeal if supported by competent evidence, even if ... there is evidence to the contrary."
 
 Sisk v. Transylvania Cmty. Hosp., Inc.
 
 ,
 
 364 N.C. 172
 
 , 179,
 
 695 S.E.2d 429
 
 , 434 (2010) (alteration in original) (citations and quotation marks omitted). Because acts of the trial court under its inherent authority are discretionary in nature, when reviewing the trial court's conclusions of law, "we need determine only whether they are the result of a reasoned decision[.]"
 
 Id.
 
 at 180,
 
 695 S.E.2d at 435
 
 (citation omitted);
 
 see also
 

 In re Cranor
 
 ,
 
 247 N.C. App. 565
 
 , 573,
 
 786 S.E.2d 379
 
 , 385 (2016) ("The proper standard of review for acts by the trial court in the exercise of its inherent authority is abuse of discretion." (citation omitted)). By way of example, "[w]hen discretionary rulings are made under a misapprehension of the law, this may constitute an abuse of discretion."
 
 Gailey v. Triangle Billiards & Blues Club, Inc.
 
 ,
 
 179 N.C. App. 848
 
 , 851,
 
 635 S.E.2d 482
 
 , 484 (2006) (citations omitted).
 

 Analysis
 

 I. Findings of Fact
 

 Respondent argues there is insufficient evidence to support 12 of the trial court's Findings. We disagree.
 

 *702
 
 Respondent first challenges Finding 4, which states:
 

 [Respondent] failed to appear at the appointed time on March 29, 2018 in Courtroom 10-B presided over by Judge A. Graham Shirley ("Judge Shirley"). The Courtroom Clerk in Courtroom 10-B received a call from the Courtroom
 
 *428
 
 Clerk in Courtroom 2-A and indicated that [Respondent] was in that Courtroom and was attempting to determine which court had priority despite previously being told that he was expected in Courtroom 10-B at 12:00 p.m. Judge Shirley went to Courtroom 2-A to discuss this matter with the presiding District Court Judge Ashleigh P. Dunston ("Judge Dunston").
 

 In his brief, Respondent contends this Finding is unsupported because Judge Shirley testified he came down to Judge Dunston's courtroom before 12:00 p.m. However, competent evidence was presented at the hearing showing Respondent did not appear in Judge Shirley's courtroom at the appointed time, 12:00 p.m. At the 1 June 2018 hearing, Judge Shirley testified "[a]t 12 o'clock, [Respondent] had not shown up." Further, Judge Shirley's courtroom clerk testified Respondent was not in Judge Shirley's courtroom by 12:00 p.m. on 29 March 2018. Therefore, this Finding is supported by competent evidence.
 

 Respondent next challenges Findings 5 and 6, which state:
 

 5. In the course of their conversation in Courtroom 2-A, Judge Dunston informed Judge Shirley that she was of the opinion that [Respondent] was impaired. She recounted that while [Respondent] was in or around Courtroom 2-A, Judge Dunston observed that [Respondent] spoke in a rambling and sometimes ranting fashion, had slurred speech and dilated eyes, and that she believed him to be under the influence of an impairing substance.
 

 6. The Courtroom Clerk in Courtroom 2-A also formed the opinion that [Respondent] was impaired. She observed that [Respondent] initially appeared lethargic, and that he spoke with slurred speech, was sweaty, and that he frequently wiped his face and tugged at his collar. This same Clerk also encountered [Respondent] outside of the courthouse during the lunch hour, and [Respondent] was walking down stairs in a very unsteady manner and needed to steady himself on the hand rails.
 

 Respondent contends these Findings are not supported by competent evidence because (1) Judge Dunston testified several times that she was unsure if Respondent was impaired and (2) the Courtroom Clerk in 2-A, Christina Sollers, testified she could not tell whether Respondent's eyes were dilated.
 

 *429
 
 First, Respondent mischaracterizes Judge Dunston's testimony. Although Judge Dunston did testify that on 29 March 2018 she initially "did not know for sure" whether Respondent was impaired, her testimony throughout the 1 June 2018 hearing consistently shows she believed Respondent was impaired that day. Judge Dunston testified, "I definitely thought something was wrong [with Respondent]. His eyes did appear dilated; they -- you know, his words were slurred; he was rambling about things that had nothing to do with what we were talking about[.]" Judge Dunston also notified Judge Shirley of her suspicions regarding Respondent's impairment, and Judge Dunston also testified she thought "[Respondent] was impaired on some type of pill or something."
 

 As for Finding 6, although Christina Sollers stated she could not tell whether Respondent's eyes were dilated, she consistently testified Respondent seemed impaired on 29 March 2018. Sollers averred Respondent seemed impaired because "he seemed a little lethargic .... He was very sporadic. He came to court late. He slurred his words. He tugged on his collar a lot; wiped his face a lot." In addition, Sollers testified Respondent seemed sweaty and she observed Respondent needing to steady himself as he walked down a flight of stairs at the courthouse. Therefore, competent evidence supports the trial court's Findings 5 and 6.
 

 In addition, Respondent asserts Finding 7 is not supported by competent evidence, which Finding states: "After speaking with Judge Dunston and upon leaving Chambers for Courtroom 2-A, Judge Shirley witnessed [Respondent] speaking with a Deputy of the Wake County Sheriff's Office. Based
 
 *703
 
 upon [Respondent's] speech he continued to appear impaired and disoriented." Respondent contends because the Deputy did not testify, this Finding is unsupported. However, Finding 7 relates to Judge Shirley's impressions of Respondent during his conversation with the Deputy, which Judge Shirley was competent to testify about because he personally witnessed the conversation.
 
 Cf.
 

 Robbins v. Trading Post, Inc.
 
 ,
 
 251 N.C. 663
 
 , 666,
 
 111 S.E.2d 884
 
 , 886 (1960) ("A witness is not competent to testify to a fact beyond his personal knowledge or to base an opinion upon facts of which he has no knowledge." (citations omitted)). Therefore, the fact that the Deputy did not testify is inconsequential to Finding 7.
 

 Respondent next challenges Finding of Fact 9, which provides: "Immediately upon appearing before Judge Shirley, [Respondent] requested five minutes to 'collect' himself. [Respondent] appeared somewhat distressed and disoriented." Respondent argues this Finding is unsupported by competent evidence because on cross-examination
 
 *430
 
 Respondent played a recording of the 29 March 2018 hearing showing Respondent requested to "have one -- one moment[,]" without saying it was to "collect" himself. However, the trial court's Finding that Respondent's request for a moment was to "collect" himself is a reasonable inference from Judge Shirley's testimony.
 
 See
 

 Thompson v. Carolina Cabinet Co.
 
 ,
 
 223 N.C. App. 352
 
 , 358,
 
 734 S.E.2d 125
 
 , 128 (2012) ("While plaintiff may not have used the precise words of the findings in his testimony, the findings reasonably paraphrase plaintiff's testimony or
 
 are inferences reasonably drawn from that testimony
 
 ." (emphasis added)). In any event, this Finding is not necessary to the trial court's Conclusions of Law; therefore, Respondent's argument on this Finding is without merit.
 
 See
 

 In re Custody of Stancil
 
 ,
 
 10 N.C. App. 545
 
 , 549,
 
 179 S.E.2d 844
 
 , 847 (1971) ("Immaterial findings of fact are to be disregarded. ... It is sufficient if enough
 
 material
 
 facts are found to support the judgment." (citations omitted)).
 

 Respondent also contends Finding of Fact 10 is not supported by the evidence, which Finding states:
 

 When [Respondent] returned, Judge Shirley met with counsel in Chambers. [Respondent's] pupils were dilated, his speech was slurred, and he did not appear to be able to speak in a coherent manner. [Respondent] stated that he was taking antidepressant medication and had been diagnosed with depression and social anxiety disorder.
 

 Respondent asserts this Finding is unsupported because three of the State's witnesses testified they could not tell whether Respondent's pupils were dilated. However, Judge Shirley testified "[Respondent's] pupils were dilated." Further, Judge Dunston also testified Respondent's "eyes did appear dilated[.]" This constitutes competent evidence supporting Finding 10.
 

 Respondent next challenges Finding of Fact 12, which reads:
 

 The Courtroom Clerk in Judge Shirley's courtroom[, Caitlyn Beale,] also formed the opinion that [Respondent] was impaired on March 29, 2018. She noted that he was jumpy, erratic, sweating, not able to express coherent thoughts and that his eyes were dilated. This same clerk had seen [Respondent] on March 26, 2018 at calendar call, and his appearance and actions on March 29, 2018 were markedly different from his more normal demeanor on March 26, 2018.
 

 *431
 
 Respondent argues this Finding is unsupported because Caitlyn Beale "testified she was unsure of whether Respondent was impaired, stated she could not tell if Respondent's eyes were dilated when he first presented, and stated that Respondent's matter was never argued and thus could make no judgment of whether Respondent was able to express coherent thoughts." However, the following testimony by Caitlyn Beale supports Finding 12:
 

 Q. And did you observe [Respondent] while he was in the courtroom [on 29 March 2018]?
 

 A. I did.
 

 Q. Did he appear to you to be effective for his client?
 

 A. No.
 

 *704
 
 Q. What -- what did you witness that made you think he was ineffective?
 

 A. His behavior was very erratic. He seemed a little jumpy and he was kind of sweaty or clammy and just not able to put a coherent thought together.
 

 Q. Did -- did he -- did his eyes appear to be dilated?
 

 A. When he first came out, he was not close enough to see him [sic], so I can't really say for sure. But later, after we took a brief recess, he did come up to my desk and they did appear to be dilated.
 

 Q. Did -- did he -- and did he appear to you to be impaired by maybe a substance he was taking?
 

 A. I mean I can't say for sure, but he was not his normal self. I had seen him at calendar call that Monday and that was not his behavior on Monday.
 

 Q. And was he able to articulate an argument on behalf of his client?
 

 A. We never even heard his matter, so no.
 

 Q. So he -- why did you not hear his matter?
 

 A. Judge Shirley pulled him in chambers and asked if he was okay to proceed hearing the matter and I believe Judge Shirley didn't feel comfortable proceeding to hear
 
 *432
 
 it anyway, and so we decided to continue it to the following week.
 

 Respondent next challenges Finding 13, which provides:
 

 After leaving Courtroom 10-[B] on March 29, 2018 [Respondent] returned to Courtroom 2-A. There, Judge Dunston informed him that based upon her observations and Judge Shirley's observations, she was not going to allow [Respondent] to proceed. [Respondent] told Judge Dunston that he was not taking anything other than prescribed medications and that he was not "high." Judge Dunston asked whether he would submit to an examination by a Drug Recognition Expert (DRE) and [Respondent] answered he would. However, when the DRE arrived, [Respondent] stated that he did not want to submit to an examination and just wanted to leave.
 

 Respondent contends this Finding is not supported by the evidence because Judge Dunston testified she was unsure if Respondent was impaired and admitted she released Respondent prior to a DRE arriving. However, the following testimony regarding what Judge Dunston told Respondent upon returning to her courtroom supports this Finding:
 

 So [Respondent and opposing counsel] came up and approached the bench. And I basically told [Respondent] as nicely as I could that based upon what I believed as far as him being impaired, also the fact of what I had learned from Judge Shirley and also that [Judge] Shirley had already determined that he was not what I believed competent to proceed that day, which is why he continued the case, that at that point I said, okay, well, I don't -- I also don't believe -- if a superior court judge has done this, I - - I definitely can't have you practice in my court immediately after that. And I don't think that you should. And I had some questions this morning, but now I'm confirmed in that.
 

 And he basically told me that he had a social disorder, social - - some -- some type of disorder, that he was taking medication for that, that he's not on anything other than his prescribed medication. He -- he said that he was not -- that he was not high.
 

 ....
 

 *433
 
 And I asked him at the bench, I said, will you submit to a drug recognition expert? I have one coming and if, you know, they determine that there's nothing wrong, I mean then that's -- then it is what it is.
 

 And he told me he would. He said, yes, I will because I'm not -- there's nothing wrong with me, blah, blah, blah. And I said, Okay.
 

 ....
 

 [After approximately 20 minutes,] DRE had arrived. And so when the DRE got there, [Respondent] did not submit to his testing and said that he just wanted to leave and that he was embarrassed and that he was not going to submit to the DRE. And then that was the last time I saw him when he walked out of the courtroom.
 

 *705
 
 Although Respondent contends Judge Dunston's testimony contradicted the above exchange (without citing where in the transcript this occurred), we hold the above exchange supports Finding 13.
 
 See
 

 Sisk
 
 ,
 
 364 N.C. at 179
 
 ,
 
 695 S.E.2d at 434
 
 ("[F]indings of fact made by the trial judge are conclusive on appeal if supported by competent evidence,
 
 even if ... there is evidence to the contrary
 
 ." (alterations in original) (emphasis added) (citation and quotation marks omitted)).
 

 Respondent next challenges Finding of Fact 17, which states:
 

 In Chambers, Judge Shirley advised [Respondent] that Judge Shirley was concerned with his conduct on March 29, 2018 and that his conduct on April 6, 2018 did nothing to alleviate those concerns. Judge Shirley informed [Respondent] that the Court believed that his conduct on March 29, 2018 amounted to Contempt of Court and a violation of the Rules of Professional Conduct and that the Court had prepared a Motion to Show Cause, which he showed to [Respondent]. Judge Shirley further informed [Respondent] that first and foremost he was concerned for [Respondent's] well-being. Judge Shirley explained that he was prepared to issue and file the Motion to Show Cause but would hold off on signing any order if [Respondent] would voluntarily present himself to the Lawyer's Assistance Program (LAP) for an evaluation and follow any recommended treatment. As a further condition of not proceeding with the Motion to Show Cause,
 
 *434
 
 Judge Shirley indicated that he would only defer entering the Motion to Show Cause if [Respondent] executed a release that would allow LAP to provide the following information to the Court: (a) whether [Respondent] made contact with LAP; (b) the status of [Respondent's] participation with LAP, including whether or not he was compliant with the clinical recommendations of the LAP; (c) a copy of any LAP Recovery Contract entered into by [Respondent]; and (d) the status of [Respondent's] LAP Recovery Contract.
 

 Respondent asserts this Finding is not supported because the "release" was never introduced or admitted into evidence. However, Judge Shirley had personal knowledge of the release and was competent to testify to its contents.
 
 Cf.
 

 Robbins
 
 ,
 
 251 N.C. at 666
 
 ,
 
 111 S.E.2d at 886
 
 (citations omitted). Regarding the release, Judge Shirley testified as follows:
 

 So [Respondent] came back into chambers. I had him take a seat. And I told [Respondent], I said, [Respondent], I said, I am very concerned about what happened in my court in 10B last week. And to be honest, your conduct -- and again, I reiterated, I told him I believed he was impaired -- your conduct to me amount to contempt of court. And as a judge, that is something that I could not let pass and I was going to have to do something about it.
 

 I told him that my primary concern was his well-being and the well-being of his clients. And I showed him an order I had prepared on a Motion to Show Cause. At that point in time it's a Motion to Show Cause why he shouldn't be held in contempt of court and/or why he shouldn't be disciplined or have his -- be placed on an inactive status because of either a substance abuse problem or mental health problem. And I told him I was prepared to enter that order that day, but what I would do is I would defer entering that order on the -- on the following conditions: That he voluntarily present himself to LAP. And I disclosed what that was; that he get an evaluation. That if after the evaluation they recommended any treatment, that he'd follow that treatment protocol and whatever contract he had with LAP; and finally that -- so I could ensure that he was in compliance with whatever LAP was asking him to do, I asked him -- I told him he'd be -- have to sign a consent form. And that if he did those things, I would -- and told him what the consent form was for. And -- and told
 
 *435
 
 him that if he did those things, I would not file and make a public record.
 

 ....
 

 I -- I would not make a public. That, you know, you wouldn't have a public record with the -- the Motion to -- to Show Cause.
 

 He readily agreed. In fact, his reaction was almost one of relief. He signed the
 
 *706
 
 consent order -- or he signed the consent allowing me to monitor him. I told -- I gave him, I believe, until 5 o'clock on Monday to -- to make telephonic communication with LAP. I then informed the folks from LAP they should be expecting a call.
 

 This testimony constitutes competent evidence to support Finding 17.
 

 Respondent next challenges Findings 19 and 20, which state as follows:
 

 19. [Respondent] indicated that he wanted to voluntarily present himself to LAP and he thereafter executed the release.
 

 20. As a result of the April 6, 2018 hearing, the Court ultimately granted the Defendant's Motion for Summary Judgment. In addition to the Court concluding that the evidence did not show intentional or reckless conduct, [Respondent] failed to present any evidence in the form required by Rule 56(e) of the North Carolina Rules of Civil Procedure concerning any severe emotional distress suffered by Plaintiff. In defense of this lack of evidence [Respondent] complained to the Court that his client's deposition had not even been taken.
 

 Respondent asserts these two Findings are not supported by competent evidence because the execution of the release was not voluntary. We first note Finding 20 is immaterial to the trial court's Conclusions of Law; therefore, we do not address this Finding.
 
 See
 

 In re Custody of Stancil
 
 ,
 
 10 N.C. App. at 549
 
 ,
 
 179 S.E.2d at 847
 
 ("Immaterial findings of fact are to be disregarded." (citation omitted)).
 

 As for Respondent's contention that the execution of the release was not voluntary, Respondent did not present any evidence at the 6 June 2018 hearing, as Respondent did not attend the hearing on this date. As the above testimony in support of Finding 17 shows, Judge Shirley
 
 *436
 
 testified Respondent "readily agreed" to sign the release. Further, Kellie Myers, who witnessed Respondent sign the release, testified Respondent did not object or complain about signing the release. Therefore, Finding 19 is supported by competent evidence.
 

 Lastly, Respondent challenges Finding 23, which states: "After the hearing in this matter was concluded on June 6, 2018, [Respondent] sent communications to the Court regarding this matter. Because these communications were not offered as evidence or argument during the hearing in this matter, the communications have not been reviewed or considered by the Court."
 

 Respondent contends this Finding is "not supported by the evidence as the Prosecutor represented to the trial court that Respondent had emailed him a medical opinion on 5 June 2018." However, we fail to see how this assertion renders the Finding erroneous. Finding 23 simply indicates the trial court did not consider any post-hearing submissions by Respondent in reaching its decision. Given Respondent did not testify and Respondent's 5 June 2018 email was not received into evidence, this Finding is not erroneous.
 

 II. Subject Matter Jurisdiction
 

 Respondent challenges the trial court's Conclusion 1, which states: "This Court has personal and subject matter jurisdiction." Respondent contends this Conclusion is erroneous because the Show Cause Order was in violation of several subsections of Chapter 5A of our General Statutes, which relate to criminal contempt, thereby depriving the trial court of subject matter jurisdiction and rendering the Disability Order null and void. However, this action was not a criminal contempt proceeding; rather, the Show Cause Order and Disability Order stem from the trial court's inherent authority to regulate the conduct of attorneys appearing before it. Thus, Chapter 5A is inapplicable to this case.
 

 The courts of this State have inherent authority to regulate the conduct of attorneys practicing in this State:
 

 Attorneys are answerable to the summary jurisdiction of the court for any dereliction of duty except mere negligence or mismanagement. A court may enforce honorable conduct on the part of its attorneys and compel them to act honestly toward their clients by means of fine, imprisonment or disbarment. The power is based upon the relationship of the attorney to the
 
 *707
 
 court and the authority which the court has over its own officers to prevent them
 
 *437
 
 from, or punish them for, committing acts of dishonesty or impropriety calculated to bring contempt upon the administration of justice.
 

 In re Burton
 
 ,
 
 257 N.C. 534
 
 , 542-43,
 
 126 S.E.2d 581
 
 , 587-88 (1962) (citation and quotation marks omitted).
 

 The inherent powers of the judicial branch are those powers that are "essential to the existence of the court and the orderly and efficient exercise of the administration of justice."
 
 Beard v. N.C. State Bar
 
 ,
 
 320 N.C. 126
 
 , 129,
 
 357 S.E.2d 694
 
 , 696 (1987) ;
 
 see also
 

 Couch v. Private Diagnostic Clinic
 
 ,
 
 146 N.C. App. 658
 
 , 665,
 
 554 S.E.2d 356
 
 , 362 (2001) ("All courts are vested with inherent authority to do all things that are reasonably necessary for the proper administration of justice." (citations and quotation marks omitted)). Our Supreme Court has noted that this inherent authority encompasses not only the "power but also the duty to discipline attorneys, who are officers of the court, for unprofessional conduct."
 
 In re Hunoval
 
 ,
 
 294 N.C. 740
 
 , 744,
 
 247 S.E.2d 230
 
 , 233 (1977) (citation omitted).
 
 [2]
 
 Further, this Court has stated, "[t]here is no question that a Superior Court, as part of its inherent power to manage its affairs, to see that justice is done, and to see that the administration of justice is accomplished as expeditiously as possible, has the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it."
 
 In re Robinson
 
 ,
 
 37 N.C. App. 671
 
 , 676,
 
 247 S.E.2d 241
 
 , 244 (1978).
 

 Although we have found no case addressing the trial court's authority with regard to placing attorneys on disability inactive status, a trial court's inherent authority to regulate attorneys before it must also include the authority to place an attorney on disability inactive status under appropriate circumstances.
 
 [3]
 
 Just as our trial courts have the inherent authority to impose sanctions upon attorneys appearing before them, there is no question that a superior court, as part of its inherent power to manage its affairs, to see that justice is done, and to see that
 
 *438
 
 the administration of justice is accomplished as expeditiously as possible, has the authority to transfer an attorney to disability inactive status.
 
 See
 

 id.
 
 at 676-77, 247 S.E.2d at 244-45 (recognizing a court's inherent authority to impose reasonable and appropriate sanctions upon lawyers practicing before it);
 
 see also
 

 In re Beasley
 
 ,
 
 151 N.C. App. 569
 
 , 571-73,
 
 566 S.E.2d 125
 
 , 127-28 (2002) (upholding a trial court's order, entered pursuant to its inherent authority, suspending an attorney's license for substance abuse issues).
 
 [4]
 

 Here, the Show Cause Order states Respondent was to show cause why,
 
 inter alia
 
 , he should not be placed on disability inactive status. The Show Cause Order further provides the trial court "initiat[ed] this action on its own motion, pursuant to its inherent authority to regulate the conduct of officers of the court." In the Disability Order, the trial court explicitly found that Respondent was impaired and pursuant to its inherent authority, ordered Respondent be placed on disability inactive status. Because the trial court at all times was acting pursuant to its inherent authority to regulate officers of the court, the trial court had subject matter jurisdiction to enter its Disability Order.
 

 III. Due Process
 

 Respondent next challenges Conclusion 3, which reads: "[Respondent] received appropriate notice of these proceedings." Respondent alleges this Conclusion is erroneous because it "is not supported by evidence nor
 
 *708
 
 does it follow from the Findings of Fact[,]" and because Judge Shirley violated N.C. Gen. Stat. § 5A-13(a), which deals with notice procedures when deferring proceedings for direct criminal contempt.
 

 As already discussed, Judge Shirley's Show Cause Order was issued pursuant to the trial court's inherent authority and was not a criminal contempt proceeding. Therefore, N.C. Gen. Stat. § 5A-13(a) is inapplicable. Further, the Record shows Respondent was served with the Show Cause Order at least 17 days prior to the 1 June 2018 hearing, and at this hearing, Respondent appeared and did not object to service of the Show Cause Order.
 
 See, e.g.
 
 ,
 
 In re Howell
 
 ,
 
 161 N.C. App. 650
 
 , 655-56,
 
 589 S.E.2d 157
 
 , 160 (2003) (explaining a general appearance and failure to object by a party in an action can waive defense of insufficiency of service of process). Therefore, Conclusion 3 is supported by the Findings.
 

 *439
 
 In a similar vein, Respondent also alleges the trial court violated his due process rights by failing to give him notice.
 
 See
 

 In re Burton
 
 ,
 
 257 N.C. at 543
 
 ,
 
 126 S.E.2d at 588
 
 ("A license to engage in business or practice a profession is a property right which cannot be taken away without due process of law." (citation and quotation marks omitted)).
 

 We conclude Respondent was given due notice of the proceedings.
 
 See, e.g.
 
 ,
 

 id.
 

 Here, Respondent first learned Judge Shirley intended to file the Show Cause Order on 6 April 2018. Pursuant to the LAP Agreement, Judge Shirley waited to file the Show Cause Order as long as Respondent participated in the LAP. However, when Respondent revoked the LAP Agreement on 2 May 2018, Judge Shirley resorted to filing the Show Cause Order, as he had explicitly informed Respondent he would do if Respondent failed to comply with the LAP Agreement. Respondent was personally served with the Show Cause Order on 15 May 2018. The Show Cause Order detailed the allegations against Respondent and ordered Respondent to attend a hearing to determine "whether [Respondent is] presently suffering from a mental or physical condition (which may include but is not limited to mental illness and/or substance abuse) which significantly impairs [Respondent's] professional judgment, performance, or competency as an attorney." Prior to the hearing on 1 June 2018, Respondent hired counsel to represent him at this hearing; however, Respondent allowed counsel to withdraw on the day of the hearing. In addition, the hearing on Judge Shirley's Show Cause Order was presided over by Judge Ridgeway, who had had no previous involvement with Respondent or the events leading up to the Show Cause Order. At the hearing on 1 June 2018, Respondent represented himself, cross-examined the State's witnesses, and presented evidence. Respondent, however, failed to attend the second day of the hearing on 6 June 2018. Based on these facts, we conclude Respondent was provided due process.
 

 IV. Disability Inactive Status
 

 Lastly, Respondent challenges Conclusions 4 through 7, which state as follows:
 

 4. [Respondent's] conduct, as set out in the Findings of Fact above, demonstrates that [Respondent] suffers from a mental or physical condition that materially impairs his performance, judgment or competence as an attorney.
 

 5. Due to [Respondent's] inability to effectively handle his clients' matters, and the delays caused by his appearances
 
 *440
 
 in court in an impaired condition, his continuing to practice law poses a threat of significant potential harm to his clients, to the public, to the profession, and to the administration of justice.
 

 6. It is in the best interest of [Respondent's] clients, the public, the profession and the administration of justice that [Respondent] should be placed on disability inactive status until [Respondent] has been evaluated and treated for his impaired condition.
 

 7. It is in the best interest of [Respondent], his clients, the public, the profession and the administration of justice for [Respondent] to undergo, under the supervision of the Lawyers Assistance Program ("LAP") or some other qualified provider approved by this Court, a substance abuse evaluation, a psychiatric evaluation and a fitness to practice evaluation, and to follow all treatment recommendations found to be
 
 *709
 
 appropriate, prior to returning to active practice.
 

 Respondent essentially argues these Conclusions are not supported by the Findings because (1) the Findings are not supported by competent evidence and (2) Respondent had provided a medical opinion to the Deputy Counsel for the State Bar, who had been appointed to prosecute this matter, on 5 June 2018 that Respondent was competent to practice law. With regard to the 5 June 2018 medical opinion, Respondent failed to appear at the 6 June 2018 hearing and did not present any evidence of this medical opinion throughout the two hearings. Because this 5 June 2018 medical opinion was not admitted, the trial court did not err by failing to consider this opinion.
 

 As for Respondent's remaining argument, we have already determined the Findings were supported by competent evidence, and we hold these Findings support the trial court's Conclusions. Specifically, the Record shows all six of the State's witnesses testified to believing Respondent was impaired on two separate occasions, 29 March 2018 and 6 April 2018. Both Judges Dunston and Shirley testified they believed it was in Respondent's best interest, and the interest of the proper administration of justice, that he should be placed on disability inactive status until he has been evaluated and treated for his impaired condition. Therefore, we hold the trial court's Conclusions of Law are supported by the Findings of Fact and the trial court did not abuse its discretion by placing Respondent on disability inactive status.
 

 *441
 

 Conclusion
 

 Accordingly, based on the foregoing reasons, we affirm the trial court's Disability Order.
 

 AFFIRMED.
 

 Judges ZACHARY and BERGER concur.
 

 [1]
 

 The North Carolina State Bar Rules define "disability inactive status" as a class of membership in the North Carolina State Bar that "includes members who suffer from a mental or physical condition which significantly impairs the professional judgment, performance, or competence of an attorney, as determined by the courts, the council, or the Disciplinary Hearing Commission." 27 N.C. Admin. Code 1A.0201(c)(2)(C) (2018).
 

 [2]
 

 Indeed, in
 
 In re Hunoval
 
 , the Supreme Court was exercising its own inherent authority by entering an order of discipline against an attorney practicing before it.
 
 See
 
 id.
 

 [3]
 

 We also find support for this conclusion in the definition of "disability inactive status" found in the North Carolina State Bar Rules, which defines this class as "members who suffer from a mental or physical condition which significantly impairs the professional judgment, performance, or competence of an attorney,
 
 as determined by the courts
 
 ...."
 
 See
 
 27 N.C. Admin. Code 1A.0201(c)(2)(C) (emphasis added). This definition assumes a trial court has the necessary authority to transfer an attorney practicing before it to disability inactive status.
 

 [4]
 

 Indeed, all of the judges' efforts below were clear attempts to take proactive remedial steps in order to avoid formal discipline and provide assistance to Respondent.